**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| GREG VALEN, derivatively on behalf of BOSTON SCIENTIFIC CORPORATION,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL F. MAHONEY, JONATHAN R. MONSON, KENNETH M. STEIN, JOSEPH M. FITZGERALD, NICHOLAS SPADEA-ANELLO, YOSHIAKI FUJIMORI, DAVID C. HABIGER, EDWARD J. LUDWIG, JESSICA L. MEGA, SUSAN E. MORANO, CHERYL PEGUS, JOHN E. SUNUNU, DAVID S. WICHMANN, and ELLEN M. ZANE,<br><br>Defendants,<br><br>and<br><br>BOSTON SCIENTIFIC CORPROATION,<br><br>Nominal Defendant. | Case No.: 1:26-cv-11296<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>JURY TRIAL DEMANDED |

# VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Greg Valen ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Boston Scientific Corporation ("Boston Scientific" or the "Company"), files this Verified Shareholder Derivative Complaint against individual defendants Michael F. Mahoney ("Mahoney"), Jonathan R. Monson ("Monson"), Kenneth M. Stein ("Stein"), Joseph M. Fitzgerald ("Fitzgerald"), Nicholas Spadea-Anello ("Spadea-Anello"), Yoshiaki Fujimori ("Fujimori"), David C. Habiger ("Habiger"), Edward J. Ludwig ("Ludwig"), Jessica L.

Mega ("Mega"), Susan E. Morano ("Morano"), Cheryl Pegus ("Pegus"), John E. Sununu ("Sununu"), David S. Wichmann ("Wichmann"), and Ellen M. Zane ("Zane") (collectively, the "Individual Defendants," and together with Boston Scientific, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Boston Scientific, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and against Defendants Mahoney, Monson, Stein, Fitzgerald, and Spadea-Anello for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Boston Scientific, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by Boston Scientific's current directors and officers from July 23, 2025 through February 3, 2026, both dates inclusive (the "Relevant Period").

2. Boston Scientific is a developer, manufacturer, and marketer of medical devices that are used in a broad range of interventional medical specialties. The Company offers devices and therapies that treat complex cardiovascular, respiratory, digestive, oncological, neurological and urological diseases and conditions. Boston Scientific is split into two reporting segments:

MedSurg and Cardiovascular.

3. The Cardiovascular segment consists of the Company's Interventional Cardiology and Vascular Therapies, Watchman, Electrophysiology ("EP"), Cardiac Rhythm Management, and Interventional Oncology and Embolization product offerings. Boston Scientific's EP products are less-invasive medical technologies used in the diagnosis and treatment of heart rate and rhythm disorders. The Company's main EP product is the FARAPULSE PFA System ("Farapulse"), which launched in 2024. The Farapulse is a catheter device that uses electrical fields to target specific tissues within the heart which causes irregular heart rhythm.

4. Throughout the Relevant Period, the Individual Defendants either made or caused the Company to make false and misleading statements, pertaining to the growth and competitive landscape of Boston Scientific's EP segment. For example, on July 23, 2025, the Company held an earnings call to discuss its financial results for the second quarter of 2025 (the "2Q 2025 Earnings Call"). During the 2Q 2025 Earnings Call, Defendant Mahoney touted the growth of Boston Scientific's EP product offerings, stating in relevant part:

> ***In the second half of the year, we expect continued high single-digit growth led by our proprietary technologies and strategic partnerships globally.***
>
> * * *
>
> In the second half, we do expect contribution from our expanded conduction system pacing portfolio in the U.S. and Europe and anticipate FDA approval of the EMPOWER leadless pacemaker by year-end. ***WATCHMAN grew 28% in this quarter, reflecting continued concomitant uptake in the U.S. and the strong safety profile of our latest generation WATCHMAN FLX Pro, which recently received CE Mark. We continue to invest in further in the LAAC market, including the development of our fourth-generation WATCHMAN device, which we anticipate initiating the IDE trial for next year.***
>
> ***We continue to see considerable physician interest in concomitant procedures with over 60% of WATCHMAN implanting EPs in the U.S. having performed a concomitant procedure.*** Recently, we enrolled our first patient in the OPTION-A trial, studying concomitant use of WATCHMAN and FARAPULSE in Asia. We

> also received expanded labeling for WATCHMAN as a first-line therapy in post-ablation patients in the U.S. following the positive OPTION data, supporting continued confidence in our long-term outlook.
>
> ***Electrophysiology sales grew 94%***, lapping our first full quarter of the FARAPULSE launch in the U.S. and growing mid-teens sequentially, supported by accelerated placements of the OPA mapping system, our portfolio of access solutions and uptake of concomitant procedures.[1]

5. On September 30, 2025, the Company held an Investor Day Conference (the "2025 Investor Day Conference"). During the 2025 Investor Day Conference, Defendant Fitzgerald highlighted the growth rate of the Company's EP segment, stating in relevant part:

> I'm going to start with ***our highest growth markets, EP and WATCHMAN***. So EP, as you know, $13 billion market, largest in medtech and the fastest growing in medtech. ***So we see over the long-range plan, the EP market growing at 15% and Nick and Dr. Sutton will talk about how we're going to outpace the market.*** The basic headline there is we will continue to take share in the broad EP market, and we will enter portions of the EP market that we're not in today, such as ICE, which is a $1 billion market opportunity that we intend to use our SoundCath acquisition to get into. WATCHMAN, very similar to what I talked about in 2023.

6. The truth emerged on February 4, 2026, before the market opened, when the Company issued a press release reporting its fourth quarter and full-year 2025 financial results (the "FY 2025 Earnings Press Release"). The FY 2025 Earnings Press Release revealed disappointing financial results, stating in relevant part:

> Boston Scientific [] generated net sales of $5.286 billion during the fourth quarter of 2025, growing 15.9 percent on a reported basis, 14.3 percent on an operational basis and 12.7 percent on an organic basis, all compared to the prior year period. ***The company reported GAAP net income attributable to Boston Scientific common stockholders of $672 million or $0.45 per share (EPS)***, compared to $566 million or $0.38 per share a year ago, and achieved adjusted EPS of $0.80 for the period, compared to $0.70 a year ago.
>
> For the full year 2025, the company generated ***net sales of $20.074 billion, growing 19.9 percent on a reported basis,*** 19.2 percent on an operational basis and 15.8 percent on an organic basis, all compared to the prior year period. ***The company reported GAAP net income attributable to Boston Scientific common***

---

[1] All emphasis has been added, unless otherwise stated.

> ***stockholders of $2.898 billion or $1.94 per share***, compared to $1.853 billion or $1.25 per share a year ago, and delivered full year adjusted EPS of $3.06, compared to $2.51 a year ago.
>
> * * *
>
> ***Reported GAAP net income attributable to Boston Scientific common stockholders of $0.45 per share, compared to the company's guidance range of $0.48 to $0.52 per share***, and achieved adjusted EPS of $0.80 per share, compared to the guidance range of $0.77 to $0.79 per share.

7. During the question-and-answer session of an earnings call held the same day (the "FY 2025 Earnings Call"), an analyst asked about Boston Scientific's disappointing growth in its EP segment. Defendant Mahoney responded by attributing the disappointing growth to new competitive pressures, stating in relevant part:

> I think we've been pretty consistent with our messaging on EP. We do think the market is 18% to 20%, like we said, I ***think some maybe have overshot the market growth in Q4. When you're the highest market share leader in PFA and competitors are coming out, we planned and we do expect to lose some share given the competitive launches that are coming out and given our really dominant market share position going into 2025***. So we did anticipate that. And we are also very comfortable to say that as we looked at the end of '26, that we'll be the clear PFA market leader with growing -- and we also think our EP business grow faster than 15%.
>
> ***So with new entrants coming, it's not surprising that we lost some share***. But the overall EP growth of 35%, I think, is quite impressive given the size of that business now and grew faster overall than our competitors. ***On the first quarter guide, we guided full year to 10% to 11%, which we think is strong guidance for the -- given where we are early in the year here. And 8.5% to 10%, it's simply 2 factors really, one is our toughest comp of the year. And secondly, we do have the -- about 150 bps of impact from the ACURATE discontinuation along with the AXIOS withdrawal, well, not full withdrawal, but partial matrix withdrawal, which will impact the first half of the year.***
>
> So we see both those products -- both those issues will be addressed as you get into, call it, June for the second half of the year with the impact of ACURATE being gone, AXIOS being gone, our product launches and slightly easier comps, although it's still tough, but slightly easier in the first quarter.

8. On this news, the price of the Company's stock fell $16.12 per share, or

approximately 17.6%, from a close of $91.62 per share on February 3, 2026, to close at $75.50 per share on February 4, 2026.

9. During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to Boston Scientific, willfully or recklessly made and/or caused the Company to make false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the impact new entrants to the market would have on the EP segment was understated; (2) the growth rate and competitive advantage of the EP segment was overstated; and (3) therefore, the Company's financial outlook as provided to investors lacked a reasonable basis. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

10. Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

11. Moreover, during the Relevant Period, while the Company's stock price was artificially inflated due to the foregoing misrepresentations, six of the Individual Defendants breached their fiduciary duties by selling shares of Company stock on inside information, for which they received combined total proceeds of approximately $38.9 million.

12. The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

13. In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), its Chief Medical Officer ("CMO"), its Executive Vice President and Group President of Cardiology, and

its Global President of Electrophysiology to a federal securities fraud class action lawsuit pending in the United States District Court for the District of Massachusetts (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

14. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

15. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, the majority of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and Defendant Mahoney's, Monson's, Stein's, Fitzgerald's, and Spadea-Anello's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and of their not being disinterested or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence.

**JURISDICTION AND VENUE**

16. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise

a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

17. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

19. Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

20. The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of Massachusetts or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

21. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

22. Plaintiff is a current shareholder of Boston Scientific. Plaintiff has continuously held Boston Scientific common stock since April 14, 2021.

23. Plaintiff is a citizen of Washington.

**Nominal Defendant Boston Scientific**

24. Boston Scientific is a Delaware corporation with its principal executive offices at 300 Boston Scientific Way, Marlborough, Massachusetts 01752. Boston Scientific's common stock trades on the New York Stock Exchange Capital Market ("NYSE") under the ticker symbol "BSX."

**Defendant Mahoney**

25. Defendant Mahoney has served as the Company's CEO and as a Company director since November 2012. Defendant Mahoney has also served as the Company's President since October 2011 and as Chairman of the Board since May 2016.

26. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Mahoney made the following sales of Company stock:

| Date | Number Of Shares Sold | Price Per Share ($) | Proceeds ($) |
|---|---|---|---|
| February 2, 2026 | 1,200 | $94.06 | $112,868 |
| February 2, 2026 | 159,701 | $93.49 | $14,930,526 |

Thus, in total, before the fraud was exposed, Defendant Mahoney sold 160,901 shares of Company stock on inside information, for which he received over $15 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

27. The Schedule 14A the Company filed with the SEC on March 19, 2025 (the "2025 Proxy Statement") stated the following about Defendant Mahoney:

> Michael F. Mahoney joined the Company as our President in October 2011 and became our President, Chief Executive Officer and a Director in November 2012.

> Mr. Mahoney became our Chairman of the Board in May 2016. Prior to joining the Company, he was Worldwide Chairman of the Medical Devices and Diagnostics division of Johnson & Johnson from January 2011 to September 2011, overseeing 50,000 employees and seven franchises. Prior to assuming this position, Mr. Mahoney served as Worldwide Group Chairman of Johnson & Johnson's DePuy franchise, an orthopedics and neurosciences business, from April 2007 through January 2011. From January 2001 through March 2007, Mr. Mahoney served as President and Chief Executive Officer of Global Healthcare Exchange, a provider of supply chain solutions and services that brings together hospitals, manufacturers, distributors and group purchasing organizations. From 2015 to 2023, Mr. Mahoney served as a member of the board of directors of Baxter International Inc., a multinational health care company, and is currently a director of CVS Health Corporation. Mr. Mahoney began his career at General Electric Medical Systems, where he spent 12 years, culminating in the role of General Manager of the Healthcare Information Technology business. Mr. Mahoney also serves on the board of the Boys & Girls Club of Boston, is the Chair of the board of governors of Boston College CEO Club, and a member of the American Heart Association CEO roundtable. Mr. Mahoney received an MBA from Wake Forest University and a BA in finance from the University of Iowa.

28. Upon information and belief, Defendant Mahoney is a citizen of Massachusetts.

**<u>Defendant Monson</u>**

29. Defendant Monson has served as the Company's CFO since June 30, 2025.

30. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Monson made the following sale of Company stock:

| **Date** | **Number Of Shares Sold** | **Price Per Share ($)** | **Proceeds ($)** |
|---|---|---|---|
| August 2, 2025 | 528 | $105.41 | $55,656 |

Thus, in total, before the fraud was exposed, Defendant Monson sold 528 shares of Company stock on inside information, for which he received approximately $55,646 in proceeds. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

31. The Company's website[2] states the following about Defendant Monson:

**Jonathan "Jon" Monson** is our executive vice president and chief financial officer, a position he has held since June 2025. In this role, he is responsible for several company functions, including global controllership, global internal audit, corporate finance, treasury, corporate tax, investor relations, and corporate business development. Prior to his current role, Jon served as our senior vice president, Investor Relations and was responsible for leading engagement with investors and analysts. Previously, he served as global controller and chief accounting officer from July 2019 to March 2024. In that role, he was responsible for the company's global controllership organization, including, among other things, the company's accounting and financial planning processes. Prior to that, he served in various roles within finance and accounting, including as vice president and controller of the company's Urology business from 2016 to 2019, and vice president, Corporate Accounting from 2008 to 2016. Before joining Boston Scientific, he was a senior auditor at Arthur Andersen LLP. He received a BA degree in economics and accounting from the College of the Holy Cross and is a certified public accountant.

32. Upon information and belief, Defendant Monson is a citizen of Massachusetts.

**<u>Defendant Stein</u>**

33. Defendant Stein has served as the Company's CMO since February 2023.

34. The Company's website states the following about Defendant Stein:

**Dr. Kenneth Stein** is our senior vice president and global chief medical officer, a position he has held since February 2023. In this role he has oversight for the clinical trials, medical safety and medical affairs functions for Rhythm Management, the Global Clinical Operations (GCO) team and Global Medical Affairs team and is responsible for ensuring a cohesive clinical community of practice across the company. Dr. Stein also represents the clinical voice for our investor audiences. Previously, he was the company's senior vice president and chief medical officer, Rhythm Management and Global Health Policy, a role he served in from September 2009 to January 2023. Prior to joining Boston Scientific, Dr. Stein held the position of Associate Director of Clinical Cardiac Electrophysiology at Weill Cornell Medical Center and Associate Professor of Medicine at Cornell University. Dr. Stein is widely published, having authored over 150 peer-reviewed scientific publications in the areas of cardiac electrophysiology with special interests in cardiac resynchronization therapy and risk stratification for sudden cardiac arrest. Dr. Stein is a Phi Beta Kappa graduate of Harvard College (in Economics) and an Alpha Omega Alpha graduate from New York University School of Medicine. He completed his medical internship and residency at The New York-Presbyterian Hospital/Weill Cornell Medical Center, where he also

[2] https://www.bostonscientific.com/en-US/about-us/leadership.html

completed his cardiology and cardiac electrophysiology training.

35. Upon information and belief, Defendant Stein is a citizen of Minnesota.

**Defendant Fitzgerald**

36. Defendant Fitzgerald has served as the Company's Executive Vice President and Group President of Cardiology since May 2022.

37. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Fitzgerald made the following sales of Company stock:

| Date | Number Of Shares Sold | Price Per Share ($) | Proceeds ($) |
|---|---|---|---|
| August 1, 2025 | 50,000 | $106.63 | $5,331,670 |
| September 2, 2025 | 21,830 | $104.89 | $2,289,661 |
| September 2, 2025 | 28,170 | $105.85 | $2,981,755 |
| October 1, 2025 | 8,245 | $98.91 | $815,482 |
| October 1, 2025 | 41,755 | $99.38 | $4,107,844 |
| November 3, 2025 | 3,600 | $100.75 | $362,693 |
| November 3, 2025 | 16,928 | $99.76 | $1,688,749 |
| November 3, 2025 | 29,472 | $99.14 | $2,913,895 |

Thus, in total, before the fraud was exposed, Defendant Fitzgerald sold 200,000 shares of Company stock on inside information, for which he received approximately $20.5 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

38. The 2025 Proxy Statement stated the following about Defendant Fitzgerald:

> Mr. Fitzgerald, age 61, is our Executive Vice President and Group President, Cardiology, a position he has held since May 2022. In this role, he oversees development and commercialization of rhythm management technologies and innovative solutions that diagnose and treat coronary artery disease and structural heart disorders. Since joining the Company in 1990 as a sales representative, Mr. Fitzgerald has held a variety of management positions in our Neurovascular and Peripheral Interventions businesses, which included numerous regional and divisional sales management assignments up to and including his roles as VP, Global Marketing for the Neurovascular business and VP of U.S. sales for the Neurovascular business. During this time he served as Executive Vice President and President, Cardiology (January 2022 to April 2022), Executive Vice President and President, Interventional Cardiology (June 2020 to January 2022), Executive Vice President and President, Rhythm Management Group (2014 to 2020), Senior Vice President and President, Cardiac Rhythm Management (2011 to 2014), Senior Vice President and President, Endovascular (2008 to 2011) and President and General Manager of Peripheral Interventions and President of Electrophysiology (2005-2008) and Vice President, Marketing & Sales - Neurovascular Division (1998-2005). Mr. Fitzgerald is a member of our Global Council for Inclusion and is executive sponsor of our EmpowHER employee resource group. He received an MBA from Southern Illinois University with a concentration in marketing and finance and a BS in business from Indiana University.

39. Upon information and belief, Defendant Fitzgerald is a citizen of Minnesota.

**<u>Defendant Spadea-Anello</u>**

40. Defendant Spadea-Anello has served as the Company's Global President of EP since January 2025.

41. Upon information and belief, Defendant Spadea-Anello is a citizen of Minnesota.

**<u>Defendant Fujimori</u>**

42. Defendant Fujimori has served as a Company director since July 2016. He also served as the Chair of the Risk, Science, and Technology Committee at all relevant times.

43. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Fujimori made the following sale of Company stock:

| Date | Number Of Shares Sold | Price Per Share ($) | Proceeds ($) |
|---|---|---|---|
| July 29, 2025 | 2,901 | $106.99 | $310,378 |

Thus, in total, before the fraud was exposed, Defendant Fujimori sold 2,901 shares of Company stock on inside information, for which he received approximately $310,378 in proceeds. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

44. The 2025 Proxy Statement stated the following about Defendant Fujimori:

> Mr. Fujimori currently serves as Senior Executive Advisor of Japan to CVC Capital Partners, a position he has held since February 2017. He was an advisor to the LIXIL Group Corporation from June 2016 to December 2019 and was the President and Chief Executive Officer of the LIXIL Group Corporation from August 2011 to June 2016. Prior to joining LIXIL, he was Chairman, President and Chief Executive Officer of General Electric Japan from January 2008 to June 2011. In his 25 years at General Electric Company, beginning in October 1986, he held a variety of positions including Senior Vice President and Chief Executive Officer of a number of Asian and global business divisions, including Medical Systems, Plastics, and Capital. Mr. Fujimori also served as a member of the General Electric's Corporate Executive Council from 2001 to 2010. He formerly served as a director of Shiseido Company Limited, Toshiba Corporation, Japan Construction Material & Housing Equipment Industries Federation and Tokyo Electric Power Company Holdings. Mr. Fujimori is currently a director of Blaize, Inc., Oracle Corporation, Japan and Takeda Pharmaceutical Company Limited. Mr. Fujimori received an MBA from Carnegie Mellon Graduate School of Business and a BA in petroleum engineering from the Tokyo University of Science.

45. Upon information and belief, Defendant Fujimori is a citizen of Japan.

**<u>Defendant Habiger</u>**

46. Defendant Habiger has served as a Company director since July 2024. He also serves as a member of the Audit Committee and the Executive Compensation and Human Resources Committee.

47. The 2025 Proxy Statement stated the following about Defendant Habiger:

> Mr. Habiger is the President and Chief Executive Officer of J.D. Power, a market research and data analytics company. Prior to joining J.D. Power as its CEO in March 2018, he founded and was partner of Silicon Media Partners beginning in January 2016, served as a senior advisor at Silver Lake Partners, a private equity firm, from October 2013 to October 2020, and was a venture partner at Prizker Group, a venture capital firm, from January 2013 to October 2019. Mr. Habiger served as Chief Executive Officer of Textura Corporation through its sale to Oracle in June of 2016 and served as the Chief Executive Officer of NDS through its sale to Cisco in July 2012. Earlier in his career, he held positions of increasing responsibility at Sonic Solutions, including serving as its Chief Executive Officer through its sale to Rovi Corporation in early 2011. Mr. Habiger is a director on the Chicago Federal Reserve Board where he serves on the Governance, Human Resources and SABOR (Systems Activities, Bank Operations and Risk) Committees. He is also a director of several public and private boards, including EnerSys, a global industrial battery manufacturing company, Reddit, Inc., a social media and software company, and Xperi Inc., a consumer and entertainment licensing company, and a member of the board of trustees at Rush University Medical Center. Mr. Habiger received an MBA from The University of Chicago and a BA in business administration from St. Norbert College.

48. Upon information and belief, Defendant Habiger is a citizen of Michigan.

**<u>Defendant Ludwig</u>**

49. Defendant Ludwig has served as a Company director since March 2016 and as Lead Independent Director since May 2016. He also serves as a member of the Audit Committee and the Nominating and Governance Committee.

50. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Ludwig made the following sale of Company stock:

| **Date** | **Number Of Shares Sold** | **Price Per Share ($)** | **Proceeds ($)** |
|---|---|---|---|
| July 25, 2025 | 4,000 | $106.03 | $424,120 |

Thus, in total, before the fraud was exposed, Defendant Ludwig sold 4,000 shares of Company stock on inside information, for which he received approximately $424,120 in proceeds. His insider sale, made with knowledge of material nonpublic information before the material

misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

51. The 2025 Proxy Statement stated the following about Defendant Ludwig:

> Mr. Ludwig is the former Chairman of the Board of Becton, Dickinson and Company (BDX), a global medical technology company, having served in that position from February 2002 through June 2012. He also served as BDX's Chief Executive Officer from January 2000 to September 2011 and as its President from May 1999 to December 2008. Mr. Ludwig joined BDX as a senior financial analyst in 1979. Prior to joining BDX, Mr. Ludwig served as a senior auditor with Coopers and Lybrand (now PricewaterhouseCoopers), where he earned his CPA, and as a financial and strategic analyst at Kidde, Inc. Mr. Ludwig was a member of the board of directors of POCARED Diagnostics Ltd, a privately held company focused on infectious disease diagnostics from 2013 to 2022. He formerly served as a director of CVS Health Corporation, Aetna, Inc., Xylem, Inc. and as Vice Chair of the board of trustees of the Hackensack University Medical Center Network. Mr. Ludwig received an MBA from Columbia University and a BA in economics and accounting from The College of Holy Cross.

52. Upon information and belief, Defendant Ludwig is a citizen of Massachusetts.

**Defendant Mega**

53. Defendant Mega has served as a Company director since June 2023. She also serves as a member of the Executive Compensation and Human Resources Committee and the Risk, Science and Technology Committee.

54. The 2025 Proxy Statement stated the following about Defendant Mega:

> Dr. Mega is a leader at the intersection of technology, life sciences and healthcare. She co-founded Verily Life Sciences, LLC, a subsidiary of Alphabet Inc. focused on life sciences and healthcare, and served as Chief Medical and Scientific Officer from 2015 to January 2023. At Verily, Dr. Mega oversaw Verily's clinical and science efforts, focusing on translating technological innovations and scientific insights into partnerships and programs that improve patient outcomes. Prior to Verily, she served as a Cardiologist and Senior Investigator at Brigham and Women's Hospital from 2008 to 2015. Dr. Mega has also served as a faculty member at Harvard Medical School and with the TIMI Study Group, where she led large-scale international clinical trials evaluating novel cardiovascular therapies and directed the genetics program. Dr. Mega is currently a director of Danaher Corporation and is on the Board of Advisors at the Duke-Margolis Center for Health Policy, Stanford's Center for Digital Health and Research!America. Dr.

> Mega received an MD from Yale University School of Medicine, an MPH from Harvard School of Public Health and a BA from Stanford University.

55. Upon information and belief, Defendant Mega is a citizen of California.

**<u>Defendant Morano</u>**

56. Defendant Morano has served as a Company director since June 2023. She also serves as the Chair of the Nominating and Governance Committee and as a member of the Audit Committee.

57. The 2025 Proxy Statement stated the following about Defendant Morano:

> Ms. Morano is the former Vice President Business Development and Strategic Operations, Johnson & Johnson Medtech, having served in that position from 2020 through February 2023. Prior to this role, she served as Vice President Business Development, Johnson & Johnson Medical Devices, beginning in 2012, with responsibility for licensing, acquisitions and divestitures for its Medical Devices Group. In addition, during her time at Johnson & Johnson, Ms. Morano held a number of positions with increasing responsibility through six operating companies, primarily within Finance and Business Development, and is a former member of its MedTech Leadership Team. Ms. Morano received an MBA from Columbia University and a BA from Villanova University.

58. Upon information and belief, Defendant Morano is a citizen of New Jersey.

**<u>Defendant Pegus</u>**

59. Defendant Pegus has served as a Company director since May 2024. She also serves as the Chair of the Risk, Science and Technology Committee and as a member of the Executive Compensation and Human Resources Committee.

60. The 2025 Proxy Statement stated the following about Defendant Pegus:

> Dr. Pegus recently served as a partner at Morgan Health, where, from November 2022 to May 2024, she supported the organization's strategic investments and broader efforts to improve the quality and affordability of employer-sponsored health care. Dr. Pegus is president of Caluent, LLC, a healthcare analytics and advisory company she has owned since 2012. Dr. Pegus previously served as executive vice president of Health & Wellness for Walmart from December 2020 through March 2023, where she led the company's health care businesses and served as a senior advisor. Prior to that, Dr. Pegus served as chief medical officer

and president of Consumer Health Solutions for Cambia Health Solutions from September 2018 to December 2020. Dr. Pegus also served as the first chief medical officer of Walgreens from 2010 to 2013, and from 2007 to 2010, as general manager and chief medical officer of SymCare Personalized Health Solutions, Inc., a diabetes-focused division of Johnson & Johnson. Prior to that, Dr. Pegus served as a medical director at Aetna and Pfizer. She began her career in private practice as a cardiologist. Dr. Pegus is currently a member of the board of directors of Concentra, a provider of occupational health services. Dr. Pegus is co-founder of A New Beat, an organization focused on advancing cardiovascular health and supporting the career growth of emerging leaders in the field of cardiology, and currently serves on the boards of private organizations, including the American Heart Association. Dr. Pegus previously served as a director of several public companies, including Phreesia, Inc., Tactile Systems Technology, Inc. and Cogentix Medical, Inc. Dr. Pegus received an MD from Weill Cornell Medical College, an MPH from Columbia University Mailman School of Public Health, and a BA from Brandeis University.

61. Upon information and belief, Defendant Pegus is a citizen of New York.

**Defendant Sununu**

62. Defendant Sununu has served as a Company director since April 2009. He also served as the Chair of the Nominating and Governance Committee and as a member of the Audit Committee at all relevant times.

63. The 2025 Proxy Statement stated the following about Defendant Sununu:

Senator Sununu served as a U.S. Senator from New Hampshire from 2003 to 2009. He was a member of the Committees on Banking, Commerce, Finance and Foreign Relations, and he was appointed the Congressional Representative to the United Nations General Assembly. Before his election to the Senate, Senator Sununu served three terms as a member of the U.S. House of Representatives from New Hampshire's 1st District from 1996 to 2002, where he was Vice Chairman of the Budget Committee and a member of the Appropriations Committee. During his twelve years in Congress, he drafted and helped pass several important pieces of legislation, including the Internet Tax Freedom Act, the Survivors Benefit Act and the New England Wilderness Act. Prior to serving in Congress, Senator Sununu served as Chief Financial Officer for Teletrol Systems, a manufacturer of building control systems. Senator Sununu formerly served as a Council Member of Lloyds of London and as a director of Time Warner Cable Inc. and several private and charitable entities. Senator Sununu is a director of BlueRiver Acquisition Corp. Senator Sununu received an MBA from Harvard University and an MS and a BA in mechanical engineering from Massachusetts Institute of Technology.

64. Upon information and belief, Defendant Sununu is a citizen of New Hampshire.

**<u>Defendant Wichmann</u>**

65. Defendant Wichmann has served as a Company director since June 2021. He also serves as the Chair of the Audit Committee and as a member of the Risk, Science and Technology Committee.

66. The 2025 Proxy Statement states the following about Defendant Wichmann:

> Mr. Wichmann is the Co-Founder of Jory Capital and former Chief Executive Officer of UnitedHealth Group Incorporated, having served in that position from September 2017 through March 2021. Prior to this role, he served as President, UnitedHealth Group, beginning in November 2014, with oversight responsibility for all of UnitedHealthcare's domestic and international businesses, and for overall UnitedHealth Group performance, and as Chief Financial Officer of the UnitedHealth Group from 2011 until 2016. In addition, during his time at UnitedHealth Group, he held positions as President, UnitedHealthcare; President and Chief Executive Officer, Specialized Care Services (now OptumHealth); and Senior Vice President, Corporate Development. Prior to joining UnitedHealth Group, Mr. Wichmann was a partner at Arthur Andersen & Co. and Chief Financial Officer of Advanced Machine Company. He is currently a director of Privia Health Group, Inc. and serves on the boards of certain privately held companies where Jory Capital currently maintains an investment. Mr. Wichmann previously served on the board of directors of UnitedHealth Group Incorporated and Tennant Company. Mr. Wichmann received a BS in accounting from Illinois State University.

67. Upon information and belief, Defendant Wichmann is a citizen of Minnesota.

**<u>Defendant Zane</u>**

68. Defendant Zane has served as a Company director since April 2016. She also serves as the Chair of the Executive Compensation and Human Resources Committee and as a member of the Nominating and Governance Committee.

69. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Zane made the following sales of Company stock:

| **Date** | **Number Of Shares Sold** | **Price Per Share ($)** | **Proceeds ($)** |
|---|---|---|---|
| October 27, 2025 | 9,900 | $101.13 | $1,001,199 |
| October 28, 2025 | 2,901 | $102.24 | $296,599 |
| November 6, 2025 | 12,891 | $98.28 | $1,266,978 |

Thus, in total, before the fraud was exposed, Defendant Zane sold 25,692 shares of Company stock on inside information, for which she received approximately $2.6 million in proceeds. Her insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates her motive in facilitating and participating in the scheme.

70. The 2025 Proxy Statement stated the following about Defendant Zane:

> Ms. Zane is CEO Emeritus at Tufts Medical Center and Founding Chair at Tufts Medicine. Ms. Zane previously served as President and Chief Executive Officer of Tufts Medical Center from 2004 to 2011 when she retired from this role. Prior to this, Ms. Zane served as Network President for Mass General Brigham (formerly Partners Healthcare System), a physician/hospital network sponsored by the Harvard-affiliated Massachusetts General Hospital and Brigham and Women's Hospital. Ms. Zane also previously served as Chief Executive Officer of Quincy Hospital in Quincy, Massachusetts. Ms. Zane currently is a director of Savista, a Georgia-based private company involved with healthcare revenue cycle management; Fiduciary Trust Company, a privately owned wealth management company; and AgNovos Healthcare, LLC, a privately held medical device company, focused on bone health. Ms. Zane is currently a director of Haemonetics Corporation and Synchrony Financial and previously served as a director of Azenta, Inc., Century Capital Management, Parexel International Corporation, Lincare Holdings Inc. and Press Ganey Holdings. Ms. Zane has received Honorary Degrees from Curry College, Stonehill College, Bentley University and University of Massachusetts-Dartmouth. Ms. Zane received an MA in audiology and speech-language pathology from Catholic University of America and a BA from George Washington University.

71. Upon information and belief, Defendant Zane is a citizen of Massachusetts.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

72. By reason of their positions as officers and/or directors of Boston Scientific and

because of their ability to control the business and corporate affairs of Boston Scientific, the Individual Defendants owed Boston Scientific and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Boston Scientific in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Boston Scientific and its shareholders so as to benefit all shareholders equally.

73. Each director and officer of the Company owes to Boston Scientific and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

74. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Boston Scientific, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

75. To discharge their duties, the officers and directors of Boston Scientific were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

76. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Boston Scientific, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that

the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Boston Scientific's Board at all relevant times.

77. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

78. To discharge their duties, the officers and directors of Boston Scientific were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Boston Scientific were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Massachusetts, and the United States, and pursuant to Boston Scientific's own Code of Conduct ("Code of Conduct");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting

the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Boston Scientific conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Boston Scientific and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Boston Scientific's operations would comply with all applicable laws and Boston Scientific's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

79. Each of the Individual Defendants further owed to Boston Scientific and the

shareholders the duty of loyalty requiring that each favor Boston Scientific's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

80. At all times relevant hereto, the Individual Defendants were the agents of each other and of Boston Scientific and were at all times acting within the course and scope of such agency.

81. Because of their advisory, executive, managerial, and directorial positions with Boston Scientific, each of the Individual Defendants had access to adverse, non-public information about the Company.

82. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Boston Scientific.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

83. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

84. The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

85. The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this

plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Boston Scientific was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

86. Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

87. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Boston Scientific and was at all times acting within the course and scope of such agency.

## BOSTON SCIENTIFIC'S CODE OF CONDUCT

88. The Company's Code of Conduct notes that its "culture is based on a strong foundation of clear and simple values and behaviors which are the core of everything we do – externally and internally." The Code of Conduct also states it applies to "employees, third parties, officers, and directors of Boston Scientific worldwide."

89. Regarding waivers to the Code of Conduct, the Code of Conduct states that "Any waiver of the Code involving executive officers and directors may be made only by the Board of Directors or a Board committee comprised of independent directors and such waivers may be disclosed as required by law."

90. In a section titled "Lead by Example," the Code of Conduct states, in relevant part:

> Boston Scientific managers have a duty to foster a culture of integrity and compliance. This means that:
>
> - Managers should serve as role models and ensure that colleagues who report to them feel comfortable raising questions and concerns without fear of retaliation.
> - Any concerns or questions are addressed in a professional and timely manner.
> - Standards of integrity compliance are not compromised in obtaining business results.

91. In a section titled "Avoid Conflicts of Interest," the Code of Conduct states, in relevant part:

> You may encounter a conflict of interest when your personal interests conflict with Boston Scientific's interests. Boston Scientific expects you to use your best efforts for the Company's success and, in some cases, your personal interests may impact your ability to make sound and objective decisions. You should avoid engaging in any activity that is, or could appear to be, a conflict between your interests and those of Boston Scientific. You are responsible for understanding the Company's policies on conflicts of interest and being open and forthcoming about actual or perceived conflicts should they arise so that situations can be addressed appropriately….

92. In a section titled "Be Careful with Records," the Code of Conduct states, in relevant part:

> You are responsible for maintaining accurate and complete business records. Prepare records thoughtfully, always double-check your work, and follow any applicable documentation policies. No one should falsify or improperly change any Boston Scientific records. If you are not sure about the accuracy of information, do not guess. Do what you can to find the correct information or discuss the situation with your manager. For further information, please consult the Good Documentation Practices procedures.
>
> General best practices to ensure business records are accurate and complete include: being accurate with your time and expense entries, documenting transactions accurately, and ensuring all required information is included. In addition, do not sign someone else's name, including a customer's name or a colleague's name, "white out" information on corporate records, or backdate anything.
>
> Familiarize yourself with the retention policies and schedules that apply to the

> Company records in your possession or control. Retain and dispose of Company records according to Boston Scientific's document retention policies. Records involved in litigation or a government investigation may have other document retention requirements. For questions about document retention and classification, contact any of the resources listed at the end of the Code.
>
> We maintain a system of procedures and accounting controls to keep our disclosures accurate and in compliance with applicable legal requirements. You should always follow Company procedures for reporting and disclosing financial information, and cooperate with internal audit processes as requested. For questions about financial records, contact the Corporate Controller.

93. In a section titled "Understanding Stock Trading Rules," the Code of Conduct states, in relevant part:

> If you trade in Boston Scientific stock, take care not to engage in "insider trading." Insider trading means engaging in transactions in a company's securities (for example, buying or selling a company's stock), while aware or in possession of "material nonpublic information" about the company or its securities. When considering whether information is "material nonpublic information," ask yourself questions such as:
>
> • Has the information been released to the public by the Company, or is the information otherwise known generally to the public? If not, it is nonpublic information.
>
> • Would a reasonable investor consider the information to be important when making an investment decision? If yes, it may be material.
>
> • Would public disclosure of the information reasonably be expected to affect the price of Boston Scientific securities? If yes, it may be material.
>
> It is also prohibited to give a "tip" to anyone — including other Boston Scientific employees, family, or friends — to enable trading in Boston Scientific stock based on material nonpublic information.

94. In a section titled "Raise Questions and Concerns," the Code of Conduct states, in relevant part:

> Integrity concerns arise and can involve good people with the best intentions. Knowing just what to do can be difficult. If you are not sure, ask for advice from someone you trust or contact one of the resources listed at the end of the Code, such as the Advice Line. You can use the Advice Line to ask a question, obtain guidance, or report an integrity concern. We all have a responsibility to immediately raise any

> integrity concerns, or known or suspected violations of the Code, Company policies and procedures, and applicable laws. If you are not sure what to do, ask questions and seek advice.

95. In a section titled "Understanding Consequences," the Code of Conduct states, in relevant part:

> Boston Scientific takes violations of this Code, Company policies and procedures, and applicable laws seriously. Where appropriate, the Company takes prompt corrective action, up to and including termination of employment. Corrective action may also occur for other reasons, including if you:
>
> • Direct others to violate a law, regulation, or Company policies and procedures or applicable laws.
>
> • Know of a violation or potential violation, and fail to report it.
>
> • Fail to effectively monitor the actions of people who work for you.

96. In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Moreover, six of the Individual Defendants violated the Code of Conduct by engaging in insider trading, netting aggregate proceeds of approximately $38.9 million. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Codes of Conduct.

**BOSTON SCIENTIFIC'S AUDIT COMMITTEE CHARTER**

97. Boston Scientific also maintains an Audit Committee Charter (the "Audit

Committee Charter") which governs the Audit Committee's roles and responsibilities. The Audit Committee Charter states that the purpose of the Audit Committee is to:

> [A]ssist it in its oversight of, among other things, (i) the quality and integrity of the Company's financial reporting process, financial statements and related disclosure, (ii) compliance with financial, legal, and regulatory requirements, (iii) selection and retention of the registered public accounting firm of the Company (the "independent auditor"), and evaluation of the independent auditor's qualifications, independence, and performance, (iv) the annual independent audit of the Company's financial statements, and (v) the performance of the Company's internal audit function and financial controls.

98. In a section titled "Authority and Duties," under a subheading titled "Financial Statements and Related Disclosure," the Audit Committee Charter states, in relevant part:

> 9. The Committee shall review and discuss the annual audited financial statements and quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," before the filing of the Company's reports on Form 10-K and Form 10-Q. The Committee shall review management's and the independent auditor's judgment about the quality (not just acceptability) of accounting principles, the reasonableness of significant judgments, and the clarity and the completeness of the financial statements. The Committee shall recommend to the Board whether to include the audited financial statements in the Company's annual report on Form 10-K.
>
> 10. The Committee shall have oversight responsibility for the Company's SEC Reporting Disclosure Committee (Disclosure Committee). The Committee shall receive a report at least quarterly from the Disclosure Committee regarding the proceedings of the Disclosure Committee, including proceedings undertaken and any conclusions reached with respect to the Company's disclosure controls and procedures and internal control over financial reporting for the applicable financial statements and reports to be filed with the SEC.
>
> 11. The Committee shall review with management, the internal auditors and the independent auditor (a) reports, evaluations and recommendations of the independent auditor, including the independent auditor's report on the Company's assessment of internal controls over financial reporting, (b) all critical accounting policies and practices used by the Company in preparing its financial statements, (c) all alternative treatments of financial information within generally accepted accounting principles (GAAP) that have been discussed with management, the ramifications of the use of such alternative treatments and the treatment preferred by the independent auditor, (d) those critical audit matters (CAMs) arising from the current period audit, as reported in the independent auditor's opinion on the

> financial statements, (e) any major issues regarding accounting and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies, (f) analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative accounting methods on the financial statements and (g) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company.
>
> * * *
>
> 13. The Committee shall discuss generally and prior to public disclosure the type of information to be disclosed, and the type of presentation to be made, in earnings press releases (paying particular attention to any use of "pro forma," or "adjusted" non-GAAP, information), as well as the type of information to be disclosed, and the type of presentation to be made, in any financial information and earnings guidance provided to analysts and rating agencies.
>
> 14. The Committee shall review periodically with management, and any outside professionals as the Committee considers appropriate, important trends and developments in financial reporting practices and requirements and their effect on the Company's financial statements.

99. In the same section, under a subheading titled "Performance of the Internal Audit Function and the Independent Auditor," the Audit Committee Charter states, in relevant part:

> 17. The Committee shall review with management, the internal auditors and the independent auditor the quality, adequacy and effectiveness of the Company's internal controls, including the Company's system to monitor and manage business risk and financial risk exposure to the Company resulting from legal and regulatory compliance matters, and any significant deficiencies or material weaknesses in internal controls.
>
> 18. The Committee shall discuss the Company's guidelines, processes and policies to monitor, assess, evaluate and manage risk.
>
> 19. The Committee shall receive reports on business operations and functions, and other financial reporting and control issues directly from the internal auditors. The Committee shall monitor progress towards correction of any important deficiencies.

100. In the same section, under a subheading titled "Compliance with Legal and Regulatory Requirements," the Audit Committee Charter states, in relevant part:

> 21. The Committee shall assist the Board in its oversight of compliance with financial, legal, and regulatory requirements. The Committee shall have oversight over matters of financial compliance, including financial reporting, internal controls and financial risk exposure to the Company resulting from legal and regulatory compliance matters
>
> * * *
>
> 24. The Committee shall establish procedures for (a) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and (b) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.
>
> 25. The Committee shall oversee administration of and make appropriate recommendations regarding the administration of the Company's Stock Trading Policy, which shall include reviewing the policy on at least an annual basis.

101. In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## BOSTON SCIENTIFIC'S RISK, SCIENCE, AND TECHNOLOGY COMMITTEE CHARTER

102. Boston Scientific also maintains a Risk, Science, and Technology Committee Charter (the "Risk, Science, and Technology Committee Charter"). The Risk, Science, and Technology Committee Charter states the role of the Risk, Science, and Technology Committee is to, assist in the oversight of Boston Scientific's enterprise-wide approach to risk management,

regulatory compliance, the quality and safety of the Company's products, internal and external research and development and innovation initiatives and investments, and the commercialization of technology.

103. In a section titled "Authority and Duties," under a subheading titled "Risk Management," the Risk, Science, and Technology Committee Charter states:

> 1. The Committee shall assist the Board and the Audit Committee in its oversight of the Company's enterprise risk management program.
>
> 2. The Committee shall review and discuss the Company's guidelines, processes and policies to monitor, assess, evaluate and manage non-financial risk.
>
> 3. The Committee shall receive regular reports from the Company's management on matters relating to strategic and operational initiatives, financial performance and legal developments, which are each integrated with enterprise-risk exposures.

104. In the same section, under a subheading titled "Compliance and Quality Oversight," the Risk, Science, and Technology Committee Charter states, in relevant part:

> 1. The Committee shall assist the Board in its oversight of the Company's global compliance program, including matters related to compliance with legal and regulatory requirements as well as compliance with the Company's Code of Conduct (the "Code"). The Committee shall periodically review and, when appropriate, recommend changes to the Code to the Board.

105. In the same section, under a subheading titled "Science and Technology Oversight," the Risk, Science, and Technology Committee Charter states:

> 1. The Committee shall periodically review and assess the Company's science, technology and innovation strategy and priorities, including with respect to capital allocation, organizational structure and the competitive position of the Company's portfolio.
>
> 2. The Committee shall periodically review key programs, processes and organizational structures related to innovation, research and development, clinical trials and commercialization of technology.
>
> 3. The Committee shall stay informed of potentially disruptive science and technology trends, opportunities and risks.

106. In violation of the Risk, Science, and Technology Committee Charter, the Individual Defendants failed to oversee compliance with the Code of Conduct and failed to be informed of disruptive science and technology trends, opportunities, and risks. Specifically, during the Individual Defendants failed to correct violations of the Code of Conduct and downplayed the impact of new entrants in Boston Scientific's EP segment.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

107. Boston Scientific is a developer, manufacturer, and marketer of medical devices that are used in a broad range of interventional medical specialties. The Company offers devices and therapies that treat complex cardiovascular, respiratory, digestive, oncological, neurological and urological diseases and conditions. Boston Scientific is split into two reporting segments: MedSurg and Cardiovascular.

108. The MedSurg segment consists of the Company's Endoscopy, Urology, and Neuromodulation product offerings. The Cardiovascular segment consists of the Company's Interventional Cardiology and Vascular Therapies, Watchman, EP, Cardiac Rhythm Management, and Interventional Oncology and Embolization product offerings. Boston Scientific's EP products offer less-invasive medical technologies used in the diagnosis and treatment of heart rate and rhythm disorders. In 2024, the Company's launched its main EP product the Farapulse, which is a catheter device that uses electrical fields to target specific tissues within the heart that cause irregular heart rhythms.

### False and Misleading Statements

#### *July 23, 2025 Financial Reports*

109. On July 23, 2025, the Company issued a press release reporting its financial results for the second quarter of 2025 (the "2Q 2025 Earnings Press Release"). The 2Q 2025 Earnings

Press Release quoted Defendant Mahoney as stating, in relevant part:

> This was another excellent quarter — marked by exceptional top-line performance — that delivered margin expansion and prioritized investment for future growth. I am incredibly grateful to our dedicated global team for demonstrating clinical and commercial excellence across the company and positioning us for differentiated long-term performance.

110. The 2Q 2025 Earnings Press Release also provided investors with updated full-year 2025 guidance, stating in relevant part:

> ***The company estimates net sales growth for the full year 2025, versus the prior year period, to be approximately 18 to 19 percent on a reported basis and 14 to 15 percent on an organic basis.*** Full year organic net sales guidance excludes the impact of foreign currency fluctuations and net sales attributable to certain acquisitions and divestitures for which there are less than a full period of comparable net sales. ***The company estimates EPS on a GAAP basis in a range of $1.89 to $1.93 and estimates adjusted EPS, excluding certain charges (credits), of $2.95 to $2.99.***
>
> The company estimates net sales growth for the third quarter of 2025, versus the prior year period, to be in a range of approximately 17 to 19 percent on a reported basis, and 12 to 14 percent on an organic basis. Third quarter organic net sales guidance excludes the impact of foreign currency fluctuations and net sales attributable to certain acquisitions and divestitures for which there are less than a full period of comparable net sales. The company estimates EPS on a GAAP basis in a range of $0.44 to $0.46 and estimates adjusted EPS, excluding certain charges (credits), of $0.70 to $0.72.

111. On the same day, the Company held the 2Q 2025 Earnings Call.

112. During the 2Q 2025 Earnings Call, Defendant Mahoney touted the growth of the Company's EP segment, stating in relevant part:

> ***In the second half of the year, we expect continued high single-digit growth led by our proprietary technologies and strategic partnerships globally.***
>
> * * *
>
> In the second half, we do expect contribution from our expanded conduction system pacing portfolio in the U.S. and Europe and anticipate FDA approval of the EMPOWER leadless pacemaker by year-end. ***WATCHMAN grew 28% in this quarter, reflecting continued concomitant uptake in the U.S. and the strong safety profile of our latest generation WATCHMAN FLX Pro, which recently***

> ***received CE Mark. We continue to invest in further in the LAAC market, including the development of our fourth-generation WATCHMAN device, which we anticipate initiating the IDE trial for next year.***
>
> ***We continue to see considerable physician interest in concomitant procedures with over 60% of WATCHMAN implanting EPs in the U.S. having performed a concomitant procedure.*** Recently, we enrolled our first patient in the OPTION-A trial, studying concomitant use of WATCHMAN and FARAPULSE in Asia. We also received expanded labeling for WATCHMAN as a first-line therapy in post-ablation patients in the U.S. following the positive OPTION data, supporting continued confidence in our long-term outlook.
>
> ***Electrophysiology sales grew 94%,*** lapping our first full quarter of the FARAPULSE launch in the U.S. and growing mid-teens sequentially, supported by accelerated placements of the OPA mapping system, our portfolio of access solutions and uptake of concomitant procedures.

113. Defendant Monson also discussed Boston Scientific's updated full-year 2025 guidance, stating in relevant part:

> I will now walk through guidance for Q3 and full year 2025. ***We now expect full year 2025 reported revenue growth to be in a range of 18% to 19%*** versus 2024. Excluding an approximate 50 basis point tailwind from foreign exchange based on current rates, we expect full year 2025 operational growth to be in the range of 17.5% to 18.5%.
>
> Excluding a 350 basis point contribution from closed acquisitions, we expect full year 2025 organic revenue growth to be in a range of 14% to 15% versus 2024. We expect third quarter 2025 reported revenue growth to be in the range of 17% to 19%. Excluding an approximate 50 basis point tailwind from foreign exchange based on current rates, we expect third quarter 2025 operational growth to be in the range of 16.5% to 18.5%. Excluding an approximate 450 basis point contribution from closed acquisitions, we expect third quarter 2025 organic revenue growth to be in a range of 12% to 14%.
>
> Based on our first half margin performance, ***we now expect to expand full year adjusted operating margin by 75 to 100 basis points while increasing our level of investment in R&D to fuel durable, differentiated revenue growth***. We now expect full year 2025 adjusted below-the-line expense to be approximately $440 million.

114. During the question-and-answer session of the 2Q 2025 Earnings Call, Defendant Stein highlighted the growth of the Company's EP segment, stating:

> <Analyst> So for Mike or Dr. Stein, maybe you talked about the growth vectors for your EP business market growth, PFA adoption, new geographies, new products, et cetera. How would you have us think about these pieces and what your EP business could look like in 3 to 5 years? And any color on the proposed ASC codes and what they could mean for you?
>
> <Defendant Stein> Yes, [Analyst], it's -- well, it's a little bit all of the above. And we will get a lot deeper into that, as you say, that long-range plan look at our Investors Day. I think sort of -- again, ***the quick answer beyond it's all of the above is its continued market growth in the United States*** as you look at the safety profile with FARAWAVE, as with the predictability of the case is as you look at the efficacy, accumulating data now actually for superior outcomes compared to thermal ablation.
>
> Very pleased with what we're seeing internationally. Again, as Mike mentioned in the script, over 15,000 cases have already been performed in Japan, where even though we were third to the market, we are already the clear leaders in PFA. Very pleased with the adoption that we're seeing to date of our FARAVIEW process on OPAL, our FARAWAVE NAV catheter. And you mentioned the ASC, the proposed rule which in the United States from CMS, which would allow ablations to be performed in the ASC, if that's finalized, we see that as an advantage for us. We do think that we are uniquely positioned to take advantage of procedures in the ASC. And again, it gets to the safety, it gets to the predictability, but it also gets to some of the economic advantages using FARAWAVE with FARAVIEW compared to the competition.

115. Later in the 2Q 2025 Earnings Call, Defendant Stein discussed Boston Scientific's competitive positioning in the Cardiovascular medical device landscape:

> <Analyst> Maybe I think Mike talked about the concomitant percentage, about 60% of all procedures now or all of your doctors have done at least 1 concomitant procedure. How has that trended over maybe the last 6 to 12 months, especially following the option readout? And then I do have a quick follow-up.
>
> <Defendant Stein> Maybe I would -- just to clarify that. ***So the 60% is of the electrophysiologists who do WATCHMAN implants***. And of course, it's a mix of interventional cardiology, structural heart physicians as well as electrophysiologists who do these procedures. ***But of the EPs who do the procedures who are also the ones who do ablation, right, 60% of EPs who have been WATCHMAN implanters have already jumped on to the concomitant bandwagon.***
>
> ***Now I think just in terms of understanding sort of where the growth there is***, right, remember, although some folks were doing concomitant procedures even before CMS established the unique DRG to pay for it, really, we only have reimbursement at the hospital level for concomitant beginning in October of last

> year. And then the OPTION data was only released in November of last year. So right, ***this is all still a very new phenomenon***, and we still see physicians needing to understand how you adopt in the workflow. So sequentially, still seeing important growth in the concomitant in the concomitant procedure.

116. In response to a follow up question, Defendant Mahoney touted the growth of the Company's EP segment, stating in relevant part:

> <Analyst> Okay. Yes, Dr. Stein, I know, we're early days there. I guess the follow-up question would really be kind of dovetailing off of David Roman's question about the breadth of the portfolio that you have here. In mapping now with concomitant with obviously best-in-class product with WATCHMAN by a mile. Just your ability because I know a big concern that investors have is just competition coming in, you've got some established competitors with big mapping footprint out there.
>
> So just your ability to kind of defend yourself or just said another way, the most you're building here between OPAL, all the catheters plus concomitant cases. How wide is that moat in your opinion and how much wider can it get?
>
> <Defendant Mahoney> ***Well, we continue to aim to be, as I mentioned, the clear PFA leader, and we aim to be the #1 overall in EP as we widen that portfolio.*** I think a good testament is what happened in Japan. We're 1/3 to market in Japan without a persistent label indication, which our competitors had. And now we're the clear leader in Japan, and we'll be adding persistent label to it.
>
> So we do feel like we have some unique advantages that are highly differentiated with FARAPULSE and Ken detailed out, and you'll see at the Investor Day quite a bit, how we're widening the portfolio for -- and then plus the underlying market growth is nearly 20% right now. ***And clearly, that will slow down over time. But it will still be likely mid-teens growth and the largest, fastest-growing market in med tech*** . . .

***September 30, 2025 Investor Day Conference***

117. On September 30, 2025, the Company held the 2025 Investor Day Conference. During the 2025 Investor Day Conference, Defendant Fitzgerald touted the growth of the Company's EP segment, stating in relevant part:

> I'm going to start with ***our highest growth markets, EP and WATCHMAN***. So EP, as you know, $13 billion market, largest in medtech and the fastest growing in medtech. ***So we see over the long-range plan, the EP market growing at 15% and Nick and Dr. Sutton will talk about how we're going to outpace the market.*** The

> basic headline there is we will continue to take share in the broad EP market, and we will enter portions of the EP market that we're not in today, such as ICE, which is a $1 billion market opportunity that we intend to use our SoundCath acquisition to get into. WATCHMAN, very similar to what I talked about in 2023.

118. Defendant Spadea-Anello also highlighted the growth of Boston Scientific's EP segment, stating in relevant part:

> I lead the exciting and innovative Electrophysiology business here at Boston Scientific . . . our new vision is not just to be a leader in pulse field ablation, but to be a leader in overall electrophysiology and we aim to do that as fast as we possibly can with what is an all-encompassing EP portfolio that we think is going to be significant to offer.
>
> * * *
>
> ***We've got an EP market that is meaningfully large and rapidly expanding, and we see strong adoption of PFA. We see that action going from 50% today globally to 80% in 2028 with FARAPULSE.*** We're uniquely positioned to lead and backed by our deep experience and the continued evolution of our PFA catheter portfolio that you saw here today. Our growth is globally diversifying, creating meaningful new revenue opportunities as we expand into large international markets and a decent product segments such as ICE.
>
> In terms of our innovation and ecosystem, ***Boston Scientific is committed to advancing its comprehensive EP offering*** as it integrates all of its FARAPULSE PFA catheters with its OPAL mapping system. ***We think that further strengthens our leadership position.***

119. During the question-and-answer session of the 2025 Investor Day Conference, Defendant Spadea-Anello continued to tout the growth in the Company's EP segment:

> <Analyst> I think arguably, one of the biggest concerns investors have is your share within the PFA ablation catheter segment as competition increases. Where do you think your share of PFA is today? What are you assuming for your PFA share over the LRP? And your slide said you aim to be the EP market leader. Do you expect to get there by 2028?
>
> <Defendant Spadea-Anello> A couple of things. So first of all, we don't share details -- specific details on market share. But I hope that seeing the number of patients we've been able to serve and the portfolio that we have, today's workhorse catheter is the fairway of catheter. And the simplicity of it, the versatility of it to do multiple lesions, whether it's PVI, posterior wall and persistent or paroxysmal patients. ***We think as we evolve that even further with all the mapping capabilities***

> ***integrated and the portfolio to offer other tools, we can do a lot of things there that continues this growth journey into the foreseeable future. We feel very confident about that.***
>
> And you're going to see other strategics. The good thing is that we were first with PFA. And while other strategics had other energy modalities that they did very well in, they came a little bit later. And that waveform in our catheters today, the engineering behind that is meaningfully different and in every one of those catheters. ***So as we move forward, we feel very confident that we can continue to do well.***

120. Defendant Spadea-Anello also discussed how the introduction of new catheterization laboratories and the features of the Farapulse system helped grow Boston Scientific's EP segment, stating in relevant part:

> <Analyst> Danielle Antalffy from UBS. Just a question on the market growth given for the EP business, but also WATCHMAN and just thinking about the concomitant procedure, but also separately, I mean, what is the rate limiting factor? Because you look at the TAM numbers and growth feels like it could be even faster and more aggressive than what you guys are laying out there. So curious about how you're thinking about capacity ramping to take in all these patients, but also things like pricing as this becomes a bigger ticket item for hospitals
>
> <Defendant Spadea-Anello> . . . So first of all, a lot of cath labs or hospitals are expanding the number of cath labs in their AF centers today. So we're seeing that happen in a lot of big centers to really fuel that. But we also see site of service with these ASCs that are going to start up. And to Joe's point, we have that flexibility. ***When we introduced pulse field ablation with FARAPULSE, we see the average cath lab doing 30-plus percent more. And that's not all of the operators that are getting trained today to be able to do these procedures.***
>
> So as we expand and we go deeper and we introduce this to more centers around the world, we continue to see that. ***So it's dynamic, Danielle, but we see a lot of new growth just in the introduction to new centers and cath lab capacity expanding as well as ASCs opening.***

121. Defendant Spadea-Anello also elaborated on the competitive landscape and the Company's growth strategy in the EP segment:

> <Analyst> Anthony Petrone, Mizuho. Lazania comment, by the way, was great. Maybe a little bit on the competitive landscape in EP when you think of complex cases versus single-shot cases. There's a little bit of noise out there that, that competition may be gaining in complex cases. So maybe a little bit on that and the

competitive response in complex versus simple cases. And then renal denervation, you quote $1 billion opportunity. Can you go through really the target in that uncontrolled hypertension market? What is the blood pressure measure and the medication utilization intensity in that $1 billion?

<Defendant Spadea-Anello>. . . ***Right now, our play with complex procedures, which is a smaller segment of the PFA market today, it will grow over the course of the next several years***. The vast majority of the market is going to be PVI and posterior wall. And that's going to be in paroxysmal and persistent patients with the tools that we have that will evolve. ***But as you look at the complex opportunity, we've got FARAFLEX that we think is going to really revolutionize the experience to go after complex arrhythmia.***

As I've mentioned in my presentation, the ability to have customizable lesions with monopolar and bipolar to get deeper where you need to go deeper. Other wide area form factors that are out in the market today were born as RF catheters. And PF was placed on them because the movement was happening so fast, and that would have missed a tremendous opportunity. We build a ground-up PFA catheter for complex in BT to give you deeper lesions. ***And so we're going to corner that market. We also have, call it, more challenging cases, Cortex that you heard from Dr. Brad Sutton. So we've got a suite of offerings that makes us really competitive, not just in the workhorse area of the market, but also the complex areas.***

122. Defendant Spadea-Anello further commented on Boston Scientific's competitive advantage in the EP space, stating:

<Analyst> Matt O'Brien, Piper Sandler. I kind of want to circle back to what Larry started off with on the share dynamic in EP because by my numbers, you're about ***75%, 80% share of PFA at this point. I can think back to -- although there's two of you in the space now essentially at this point, right, you guys and Medtronic***. I can think back to other categories like DES and CRM, where you've seen a lot of variability in share over time. What makes it different for you guys with PFA and your portfolio this time where you can insulate yourself and keep that share versus what we've seen with some pretty big share movements in other areas of cardio historically?

<Defendant Spadea-Anello> It's a great question. ***And again, we're not going to be respectfully specific on share. But what's different about this is the ecosystem, and you saw that slide. The ecosystem starts to take, call it, PFA today that is going to have mapping capabilities and some of the things that I talked about that will be exclusive and unique to us.***

***The FARAWAVE catheter, third generation with all those electrodes, you won't be able to get all those features and capabilities unless you have an open mapping***

> ***system that ties that together.*** ICE, which Dr. Sutton spoke about, which is a new opportunity with AI. As you think about the evolution and the cadence of the launch of ICE, that will all be integrated into our mapping system. You'll also have Cortex. We'll see how that plays out. We're very optimistic about that. That will be integrated.
>
> ***So we're insulating ourselves by having an entire ecosystem tied to our mapping system.*** And we know that the hard way because we lost when it came to RF and tying it together. We learned the hard way when it comes to now having a new energy modality where we're leading and leading big to capitalize on that and capitalize on that in a big way. That's how I'd answer that question.

***October 22, 2025 Financial Reports***

123. On October 22, 2025, the Company issued a press release reporting its financial results for the third quarter of 2025 (the "3Q 2025 Earnings Press Release"). The 3Q 2025 Earnings Press Release stated, in relevant part:

> [The Company] generated net sales of $5.065 billion during the third quarter of 2025, growing 20.3 percent on a reported basis, 19.4 percent on an operational basis and 15.3 percent on an organic basis, all compared to the prior year period. The company reported GAAP net income attributable to Boston Scientific common stockholders of $755 million or $0.51 per share (EPS), compared to $469 million or $0.32 per share a year ago, and achieved adjusted EPS of $0.75 for the period, compared to $0.63 a year ago.

124. The 3Q 2025 Earnings Press Release quoted Defendant Mahoney as stating that the Company had an "exceptional quarter of strong performance across businesses and regions," and that "[a]s we shared at our recent Investor Day meeting, we are well-positioned for differentiated growth that is fueled by our category leadership strategy, relentless focus on innovation and commitment to scaling capabilities."

125. The 3Q 2025 Earnings Press Release also provided investors with updated full-year 2025 guidance:

> The company estimates ***net sales growth*** for the full year 2025, versus the prior year period, ***to be approximately 20 percent*** on a reported basis and approximately 15.5 percent on an organic basis. Full year organic net sales guidance excludes the impact of foreign currency fluctuations and net sales attributable to certain

> acquisitions and divestitures for which there are less than a full period of comparable net sales. ***The company estimates EPS on a GAAP basis in a range of $1.97 to $2.01*** and estimates adjusted EPS, excluding certain charges (credits), of $3.02 to $3.04.
>
> The company estimates net sales growth for the fourth quarter of 2025, versus the prior year period, to be in a range of approximately 14.5 to 16.5 percent on a reported basis, and 11 to 13 percent on an organic basis. Fourth quarter organic net sales guidance excludes the impact of foreign currency fluctuations and net sales attributable to certain acquisitions and divestitures for which there are less than a full period of comparable net sales. The company estimates EPS on a GAAP basis in a range of $0.48 to $0.52 and estimates adjusted EPS, excluding certain charges (credits), of $0.77 to $0.79.

126. Later that same day, the Company held an earnings call to discuss its financial results for the third quarter of 2025 (the "3Q 2025 Earnings Call").

127. During the 3Q 2025 Earnings Call, Defendant Mahoney touted the growth of the Company's Cardiovascular business as a whole, including its EP segment:

> I'll now provide some additional highlights on our third quarter results and outlook. ***Regionally, on an operational basis, the U.S. grew 27% with an impressive growth. The excellent growth is broad-based across our Cardiovascular businesses, Endoscopy and Neuromodulation.***
>
> * * *
>
> ***WATCHMAN grew an outstanding 35% this quarter and surpassed 600,000 patients targeted to date. The excellent growth in the quarter reflects accelerated concomitant uptake in the U.S.*** and continued penetration into the 5 million patients indicated today through excellent clinical results and strong patient and physician awareness. ***We continue to expect approximately 25% of the U.S. WATCHMAN procedures to be don e concomitantly exiting '25 with a potential for that to double by 2028, enabled by the trusted FARAWATCH approach. We are confident that we can continue to grow the WATCHMAN market by approximately 20% for the years to come*** driven by continued concomitant uptake, the upcoming data presentation of CHAMPION in the first half of '26 and the launch of our next-generation device, WATCHMAN Elite, expected in late '27 or early '28.
>
> ***Turning to EP. We're incredibly proud of our EP performance, with third quarter sales growing 63% as we drive continued share gains in the overall EP market.*** FARAPULSE remains the leading PFA technology having treated over 500,000 patients to date with consistent and reproducible real-world results, further

demonstrated in the recently published 1-year results from the FARADISE trial, which showed favorable procedural and safety outcomes and clinical effectiveness across ablation strategies and AF types.

***In the U.S., we saw continued strong double-digit growth in FARAPULSE*** supported by ramping adoption of our OPAL HDx mapping system, with 1 in 3 FARAPULSE accounts now utilizing our integrated FARAWAVE NAV and OPAL device. ***The team is executing our pipeline strategy, and we recently launched our contact sensing feature and are moving to full release this month.***

128. Defendant Mahoney additionally discussed the continued growth of Boston Scientific's EP segment, stating in relevant part:

***Looking forward, our aim is to grow -- continue to grow our share in the overall EP market, and we expect to retain a strong leadership position in PFA,*** enabled by our innovative portfolio, expanding mapping and commercial resources and consistent data publications. ***We expect global PFA penetration to continue to expand and to exit 2025 at 50% penetration and grow to approximately 80% by 2028.***

* * *

***By year-end '25, we expect to make meaningful progress towards expanding access to new technologies in more complex and redo patients with the launch of our FARAPOINT PFA catheter as well as initiating enrollment in the OPTIMIZE trial, which will study the integration of OPAL in the Cortex AI algorithm.*** Cortex is a differentiated mapping software designed to precisely visualize and target sources of arrhythmias, addressing an unmet need in the treatment of persistent AF patients with unexplained reoccurrence.

***In closing, I look forward to finishing out an outstanding 2025 and delivering on our guidance, which will result in another year of delivering highly differentiated financial results versus our peer group.***

129. Defendant Monson also discussed the Company's updated 2025 guidance, stating:

I'll now walk through guidance for Q4 and full year 2025. We expect full year 2025 reported revenue growth of approximately 20%. Excluding an approximate 100 basis point tailwind from foreign exchange, we expect full year 2025 operational revenue growth of approximately 19%. Excluding an approximate 350 basis point contribution from closed acquisitions, we expect full year 2025 organic revenue growth of approximately 15.5% versus 2024.

We expect fourth quarter 2025 reported revenue growth to be in the range of 14.5% to 16.5%. Excluding an approximate 200 basis point tailwind from foreign

exchange, we expect operational growth to be in a range of 12.5% to 14.5%, and excluding an approximate 150 basis point contribution from closed acquisitions, we expect fourth quarter 2025 organic revenue growth to be in a range of 11% to 13% versus 2024.

***As a result of our year-to-date margin performance, we now expect to expand full year adjusted operating margin by approximately 100 basis points at the high end of our prior range of 75 to 100 basis points, and we continue to expect full year 2025 adjusted below-the-line expense to be approximately $440 million.*** We also maintain our forecast for a full year adjusted tax rate of approximately 12.5% and an operational tax rate of approximately 14%. We expect full year adjusted earnings per share to be in the range of $3.02 to $3.04, representing growth of 20% to 21% versus 2024. We continue to expect an approximate $0.04 foreign exchange headwind on full year adjusted earnings per share. And for Q4, we expect adjusted earnings per share to be in a range of $0.77 to $0.79.

In closing, ***I'm pleased with our strong third quarter financial performance and look forward to executing on our full year 2025 guidance and our long-range financial goals, which we shared at our recent Investor Day.*** From 2026 to 2028, we're targeting 10% plus average organic revenue growth, approximately 50 basis points of annual adjusted operating margin expansion, leveraged double-digit adjusted earnings per share growth and 70% to 80% annual free cash flow conversion. We feel that these goals represent differentiated performance in medtech, and we look forward to executing on them.

130. During the question-and-answer session of the 3Q 2025 Earnings Call, Defendant Mahoney discussed the projected growth of the Company's EP segment in 2026, stating:

<Analyst> Mike, you referenced this in response to one of the earlier questions, but I was hoping you could expand on the dynamics in the business, kind of outside EP and WATCHMAN, there's obviously a disproportionate focus on those businesses given how strong a growth contribution they've been. But as we look forward, I think everyone understands that the EP business is going to decelerate given just the size and the competitive landscape there, even with strong market growth. But if you look across the rest of the portfolio, you're seeing good momentum in businesses like Neuromodulation and Endoscopy. You talked about some of the improvements you're seeing in Silk Road. But maybe help frame for us what are kind of the drivers that support the growth outlook in the rest of the business? And where you think from a product perspective, we should be focused?

<Defendant Mahoney> . . . So much of the attention goes to ***our EP business and it should, given that we were just #4, now we're a clear #2 and have higher aim over the future. But as you said, it's not going to grow as fast as it has given that we're anniversarying comps and the size of the business, but we expect it to be an outstanding performer in '26 and beyond in our EP business.*** But I'm really proud

of the rest of the divisions. And not every one of our business grows faster than market every quarter. But as a composite, we clearly do. And that's what we indicated at our Investor Day to grow faster than our 9% WAMGR.

<Analyst>. . . A question about the proposed reimbursement for AF ablation and ASCs for next year. What proportion of AF ablations do you think could be moved into the ASCs? And how could the increased capacity using ASCs help fuel additional market growth?

* * *

<Defendant Mahoney> . . . But I just think broadly on EP, we're still remarkably early in the PFA journey, given our launch, what, 18 months ago, Ken, or whatever, less than 2 years ago, I guess.

* * *

Yes. And so the ***key for us is we continue to drive new account openings around the globe. We still have a lot of work to do with new account openings in the U.S. and particularly in Asia Pac.*** And the new account openings help drive penetration. ***We also have the opportunity to continue to grow deeper with more physicians leveraging FARAPULSE. We also have the opportunity with our unique position with concomitant to train more electrophysiologists to do WATCHMAN.*** So we still have a number of EPs out there that are not doing LAC procedures and with the impact of concomitant, we are seeing an uptick in the number of physicians who want to be trained in LAC. So that ecosystem of still early innings in PFA globally, the momentum of concomitant, the demand from physicians to learn and train on WATCHMAN now to serve that need will continue to help us, which is why the ASCs are important because we do need the ASCs over time to help with the volume demands that we're seeing across these markets.

***December 2, 2025 Citi Annual Global Healthcare Conference***

131. On December 2, 2025, Defendant Fitzgerald attended the 2025 Citi Global Healthcare Conference (the "2025 Citi Healthcare Conference") on behalf of the Company.

132. During the 2025 Citi Healthcare Conference, Defendant Fitzgerald touted the growth of the Company's EP segment:

<Analyst> Excellent. Well, that just leads us straight into electrophysiology. And you have a few things going on in that area. Would you like to give us a state of the union?

<Defendant Fitzgerald> ***Sure. The EP business . . . we're growing, as you've seen***

> ***in our numbers to date, probably 2x the market, driven by the ecosystem that is everything around FARAPULSE.*** So that is the FARAWAVE catheter, the approvals we've gotten for both PVI and PVI posterior wall said another way, both paroxysmal and persistent indications, as well as the integration of FARAWAVE into our OPAL Mapping System, which we commonly refer to FARANAV. There's a bigger ecosystem that I'm sure we'll get into.
>
> But as an example, if you look at PFA cases around the globe, it's not uncommon for other catheters to be pulled to do other complex ablations, touchups, et cetera. And just recently, I think we posted yesterday, we got approval in the EU for our FARAPOINT catheter. So as we've said, we have pending FDA approval for that catheter, and it's great to bring the CE Mark in. And that just -- that's one small example of how our ecosystem around the FARAPULSE system will continue to increase over the next few years.

133. Defendant Fitzgerald also commented on the competitive landscape in the EP sector:

> <Analyst> And from in EP, we'll stick with that for now. How do you think about the changing competitive landscape? There will be a new market participant in the United States next year?
>
> <Defendant Fitzgerlad> ***Yes. I mean, surprise, surprise, everything in cardiology has multiple competitors, and it's highly competitive. That's -- it's been that same way for the 35 years I've been in cardio. So that's kind of par for the course, right?*** So we have -- the good news in a PMA-driven market is you tend not to get surprised. So you can see what's happening in the CE Mark trials. You can see what's happening in IDE approval studies in the U.S. So suffice it to say, ***I think we have a very good understanding of what competition we will face and in what time frame.*** And so I can't do much about that other than make sure that our ecosystem, the 3 catheters that you talked about, the OPAL Mapping System, the OPAL Mapping Capacity, those are the things directly in our control that we remain super focused on.

***January 13, 2026 JP Morgan Healthcare Conference***

134. On January 13, 2026, Defendant Mahoney attended the 44th Annual JP Morgan Healthcare Conference on behalf of the Company (the "2026 JP Morgan Healthcare Conference").

135. During the 2026 JP Morgan Healthcare Conference, Defendant Mahoney stated, in relevant part:

> . . . ***I think we're blessed to have, I think, the 2 most differentiated products in***

> ***med tech with WATCHMAN that has a 91% share and FARAPULSE***, we talked about the last 25 minutes. So we -- ***and then maybe the fastest-growing procedure, if you look at the fast-growing markets, EP, the WATCHMAN market actually grows faster, but not quite the size of it and then concomitant***. And we're blessed to have 2 really unique products there that our doctors are so comfortable with.
>
> And the OPTION data, the reimbursement has put a big tailwind behind that concomitant procedure that really only Boston Scientific can deliver uniquely and safely. ***And we estimate, I think, at Investor Day, about 25% of the WATCHMAN patients are being used in a concomitant procedure. We think that number can grow at least to 50, if not north of 50***. And Ken can talk about OPTION and CHAMPION, really important readout in a couple of months here.
>
> So the concomitant procedure is so efficient. It's very safe. It's economical. Hospitals enjoy the reimbursement benefit. ***We have an excellent clinical team that's very, very difficult to match to do both of those procedures. And referring physicians are very, very comfortable with it. So we continue to see that as a big tailwind for Boston Scientific.***

136. The statements referenced in ¶¶ 109-135 were materially false and misleading and/or failed to disclose, *inter alia*, that: (1) the impact new entrants to the market would have on the EP segment was understated; (2) the growth rate and competitive advantage of the EP segment was overstated; and (3) therefore, the Company's financial outlook as provided to investors lacked a reasonable basis. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## <u>THE TRUTH EMERGES</u>

***February 4, 2026 Financial Reports***

137. The truth emerged on February 4, 2026, before the market opened, when the Company issued the FY 2025 Earnings Press Release. The FY 2025 Earnings Press Release revealed disappointing financial results which missed Boston Scientific's previously issued guidance. Specifically, the FY 2025 Earnings Press Release stated, in relevant part:

> Boston Scientific [] generated net sales of $5.286 billion during the fourth quarter of 2025, growing 15.9 percent on a reported basis, 14.3 percent on an operational basis and 12.7 percent on an organic basis, all compared to the prior year period.

> ***The company reported GAAP net income attributable to Boston Scientific common stockholders of $672 million or $0.45 per share (EPS)***, compared to $566 million or $0.38 per share a year ago, and achieved adjusted EPS of $0.80 for the period, compared to $0.70 a year ago.
>
> For the full year 2025, the company generated ***net sales of $20.074 billion, growing 19.9 percent on a reported basis***, 19.2 percent on an operational basis and 15.8 percent on an organic basis, all compared to the prior year period. ***The company reported GAAP net income attributable to Boston Scientific common stockholders of $2.898 billion or $1.94 per share***, compared to $1.853 billion or $1.25 per share a year ago, and delivered full year adjusted EPS of $3.06, compared to $2.51 a year ago.
>
> * * *
>
> ***Reported GAAP net income attributable to Boston Scientific common stockholders of $0.45 per share, compared to the company's guidance range of $0.48 to $0.52*** per share, and achieved adjusted EPS of $0.80 per share, compared to the guidance range of $0.77 to $0.79 per share.

138. The 2025 FY Earnings Press Release also provided investors with first quarter and full-year 2026 guidance:

> The company estimates net sales growth for the full year 2026, versus the prior year period, to be approximately 10.5 to 11.5 percent on a reported basis and 10.0 to 11.0 percent on an organic basis. Full year organic net sales guidance excludes the impact of foreign currency fluctuations and net sales attributable to certain acquisitions and divestitures for which there are less than a full period of comparable net sales. The company estimates adjusted EPS, excluding certain charges (credits), of $3.43 to $3.49.
>
> The company estimates net sales growth for the first quarter of 2026, versus the prior year period, to be approximately 10.5 to 12.0 percent on a reported basis and 8.5 to 10.0 percent on an organic basis. First quarter organic net sales guidance excludes the impact of foreign currency fluctuations and net sales attributable to certain acquisitions and divestitures for which there are less than a full period of comparable net sales. The company estimates adjusted EPS, excluding certain charges (credits), of $0.78 to $0.80.

139. Later the same day, the Company held the FY 2025 Earnings Call. During the FY 2025 Earnings Call, Defendant Mahoney revealed disappointing growth in the Company's EP segment:

<Analyst> I'll ask the question that's on everybody's mind today. Mike, there were fears that U.S. EP and U.S. WATCHMAN could come in soft, and U.S. EP was flat with third quarter. U.S. WATCHMAN missed by a hair. What exactly happened in the quarter versus your expectations versus the market? And the reason people are concerned is these are 2 of the key growth drivers. So you talked about confidence in above 15% EP growth next year of the market. The Street is sitting at around 25%. It feels like that needs to come down. Hopefully, you could help us level set expectations for those 2 key products, what happened in the quarter and how to think about them in '26?

<Defendant Mahoney> Well, thank you, Robbie. Happy to. And I'll touch on your question. Overall, we're super pleased with the quarter and the full year growing 16%, EPS growing 22% for the full year and 6 of our 8 business divisions growing faster than the market -- growing faster than the WAMGR and setting us up for strong guide and investments for the overall company. The 2 businesses that you called out, I think you nailed it. If you look at EP, we're quite pleased. Actually, our results in Q4 exceeded our internal target. And WATCHMAN grew 29%, pretty much similar to the third quarter, as we lap the anniversary of the concomitant reimbursement a year ago.

Specific to EP, really pleased with the results of 35%. Two of our larger competitors resulted -- had results of 6.5% growth, the market leader. Third place player 12.5%. We grew 35%. So we continue to gain share overall. And to your point, we think t***he market in Q4 was closer to 18% to 20% growth rather than what some other companies have claimed at 25%. So we think the market was kind of in an 18% to 20% range, similar to what we developed internally in our plan.*** And we've called the market for 2026 about 15% growth. So we think it's an excellent market. We don't think it grew 25% in the fourth quarter. ***We grew faster than our peer group based on this percentage that I saw or that we laid out.*** We actually grew even faster outside the U.S. than the U.S.

The U.S. is more highly penetrated with PFA. There's actually more competitors present outside the U.S., and we've accelerated growth outside the U.S. ***So our PFA performance is quite strong. The market is still healthy. We think it's 18% to 20% in the fourth quarter. And we exceeded our internal plan, and we got new products approved. Our mapping footprint continues to grow, and we have a lot of clinical data that -- various clinical studies that are in flight. So we're very confident with our PFA business and our performance.***

With WATCHMAN, we grew 29%, excellent job. We pretty much are the market with WATCHMAN. Concomitant continues to grow, and we did annualize the concomitant reimbursement, which happened in fourth quarter last year. So we're quite proud of the 29%. When you come to these consensus numbers, we exceeded our guidance. We actually exceeded analyst consensus. ***The mix of that is slightly different, but it shows the power of all of Boston Scientific being able to deliver, to beat our guidance***, to beat consensus in the quarter and the full year. And we're

quite proud of the EP performance based on the commentary I just provided.

140. Later during the question-and-answer session of the FY 2025 Earnings Call, Defendant Mahoney discussed the impact of new competitors entering the EP space, stating, in relevant part:

> <Analyst> I guess I want to push a little more on U.S. EP just because it was flat sequentially and your RF competitors grew $18 million and $26 million sequentially in the U.S. So it does look like share change versus last quarter at least on a sequential basis. And I don't know if there was something that changed late in the quarter because you were pretty bullish at some December meetings with investors. And so I don't know if there's anything kind of changed at the end of the quarter and especially considering the Q1 guide of 8.5% to 10% and kind of what that means for EP in the early part of '26.
>
> <Defendant Mahoney> I think we've been pretty consistent with our messaging on EP. We do think the market is 18% to 20%, like we said, ***I think some maybe have overshot the market growth in Q4. When you're the highest market share leader in PFA and competitors are coming out, we planned and we do expect to lose some share given the competitive launches that are coming out and given our really dominant market share position going into 2025***. So we did anticipate that. And we are also very comfortable to say that as we looked at the end of '26, that we'll be the clear PFA market leader with growing -- and we also think our EP business grow faster than 15%.
>
> ***So with new entrants coming, it's not surprising that we lost some share.*** But the overall EP growth of 35%, I think, is quite impressive given the size of that business now and grew faster overall than our competitors. ***On the first quarter guide, we guided full year to 10% to 11%, which we think is strong guidance for the -- given where we are early in the year here. And 8.5% to 10%, it's simply 2 factors really, one is our toughest comp of the year. And secondly, we do have the -- about 150 bps of impact from the ACURATE discontinuation along with the AXIOS withdrawal, well, not full withdrawal, but partial matrix withdrawal, which will impact the first half of the year.***
>
> So we see both those products -- both those issues will be addressed as you get into, call it, June for the second half of the year with the impact of ACURATE being gone, AXIOS being gone, our product launches and slightly easier comps, although it's still tough, but slightly easier in the first quarter.

141. Additionally, the FY 2025 Earnings Call contained the following exchange between an analyst and Defendant Mahoney regarding the growth of Boston Scientific's EP

segment in the 2026 fiscal year:

> <Analyst> I hate to stick with EP, but looking at the EP discussion from another angle, maybe talk us through your expectations for how the '25 (sic) [ '26 ] year is going to unfold, maybe the cadence of the year, specifically relating to better understanding the growth acceleration that seems likely to occur as the quarters progress, helped by your innovation pipeline. And so maybe you can drill down further into what are the implications of FARAPOINT and talk to us again about the ancillary products like ICE catheter, et cetera. And maybe any updates on the FARAFLEX timing. So we better understand how -- again, the cadence of '25 and the setup as we head into -- I'm sorry, for '26 and the setup for '27.
>
> <Defendant Mahoney> ***Sure. I guess as we exit '25, we're kind of in a, what, 65-ish percent PFA market share position. We have a market that we think is going to grow 15%. We have high utilization in the U.S., call it, 80% -- 70%, 80% and outside the U.S., quite a bit lower. So with a healthy market, we expect to continue to grow above market.*** Our PFA share will reduce somewhat, but we're very confident by year-end, likely if you add all the other competitors together, our share will be equal to them or in that area. We're not going to break out share by quarter, but we're very confident that we'll maintain clear market leadership in PFA over the course of 2026 and beyond.
>
> And I think if you look at the drivers that continue the strong pace of growth overall, one, it's geographic scope. We continue to gain share in Japan. We just got a persistent indication. We continue to drive more account openings, utilization in Japan. China is a very, very big market, a small part of our number. We made significant investments in the past 18 months in China, and you'll see China have a more significant impact on our overall global growth.
>
> Europe is the most competitive market, but our growth rate is quite impressive there, and we just got approval for the FARAPOINT catheter. ***In the U.S., same thing, now more significant mapping -- scaled mapping commercial team continues to gain experience, continues to add more mappers, more OPAL systems. The FARAPOINT product will allow us more time in the lab to expand our reach in different clinical indications. And we have a host of products in the pipeline***. You mentioned a few of them. They won't impact 2026 in a meaningful way. But we will continue to widen out the portfolio with our Cortex clinical trial work being done, the recent FARAPOINT approval. And then we have a whole cadence of new catheters coming over the coming 1 to 3 years. So we have significant investments in the portfolio, and we continue to expect to be the clear market leader and have a very strong '26 growing faster than market.

142. The FY 2025 Earnings Call also contained the following exchange between an analyst and Defendant Stein regarding the efficiency of the Company's EP products:

<Analyst> And Mike, sorry, this is another EP, WATCHMAN question. And maybe it's actually for Dr. Stein though. I mean, I guess I'm curious, as you see competitors launch, I know you guys talked about like pretty significant efficiency gains with FARAPULSE and PFA devices overall. Those are probably slowing. We have WATCHMAN coming. I mean I asked this at the Analyst Day, but I'm just curious what's playing out in the real world as far as capacity at the EP lab because a lot of the docs we talk to sound like they have growing waitlist for their EP procedures, and this could only just get exacerbated once CHAMPION comes, assuming CHAMPION is positive. So I'm just curious what you could say to that and how much that is currently impacting overall market growth.

<Defendant Stein> Yes, Danielle. I mean I think you nailed it, right? I ***mean we've now anniversaried -- I mean we're 3 years into the launch of FARAPULSE in the U.S. I think the efficiency gains that people saw are largely now built into the system.*** And I think as Mike said, that's why what we're looking for, again, is 15% growth in the EP market next year. ***Again, we are growing and believe we will continue to grow faster than that market. But the keys -- again, feel a little sort of almost silly that I'm apologizing for 15% growth in what's one of the largest markets in med tech.***

But the keys to driving that forward will be, A, starting the build-out of ASCs in the United States to unlock some more capacity and reduce those waiting lists, continued just development and repurposing cath labs for the use for EP procedures in the hospital, continuing what we can do as a company to help further drive greater efficiency in procedures. So things that we can do with concomitant procedures, just growth of concomitant overall helps with that efficiency. We've talked about some of the other investments that we've made, the partnership with Siemens on 4D ICE. ***But really, until all of those things play out, that's why we really don't see growth exceeding 20% in the market and why that 15% seems to us to be a much more realistic way to view it. But again, to close, but it is our intent to continue to grow faster than that market.***

143. On this news, the price of the Company's stock fell $16.12 per share, or approximately 17.6%, from a close of $91.62 per share on February 3, 2026, to close at $75.50 per share on February 4, 2026.

## DAMAGES TO BOSTON SCIENTIFIC

144. As a direct and proximate result of the Individual Defendants' conduct, Boston Scientific has lost and expended, and will continue to lose and expend, many millions of dollars.

145. Such expenditures include, but are not limited to, legal fees, costs, and any

payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

146. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

147. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

148. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

149. As a direct and proximate result of the Individual Defendants' conduct, Boston Scientific has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

## DERIVATIVE ALLEGATIONS

150. Plaintiff brings this action derivatively and for the benefit of Boston Scientific to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Boston Scientific, unjust enrichment, waste of

corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

151. Boston Scientific is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

152. Plaintiff is, and has been at all relevant times, a shareholder of Boston Scientific. Plaintiff will adequately and fairly represent the interests of Boston Scientific in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

153. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

154. A pre-suit demand on the Board is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following twelve individuals: Defendants Mahoney, Fujimori, Habiger, Mega, Morano, Ludwig, Pegus, Sununu, Wichmann, Zane (the "Director-Defendants") and non-parties Cathy R. Smith and Christophe P. Weber (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to six of the twelve Directors who are on the Board at the time this action has commenced.

155. Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against

themselves and the other perpetrators of the scheme.

156. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Boston Scientific to issue materially false and misleading statements. Specifically, the Director-Defendants caused Boston Scientific to issue false and misleading statements which were intended to make Boston Scientific appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

157. Additional reasons that demand on Defendant Mahoney is futile follow. Defendant Mahoney has served as the Company's President since October 2011, its CEO and a Company director since 2012, and as the Company's Chairman since May 2016. The Company provides Defendant Mahoney with his principal occupation. Thus, as the Company admits, he is not independent. As a Company director and the Company's highest officer, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein and personally made many of the false and misleading statements alleged herein. Moreover, his insider sales made during the Relevant Period while the price of the Company's stock was artificially inflated due to the misrepresentations discussed herein further demonstrate his motive in participating in the fraud. Defendant Mahoney is also named as a defendant in the Securities Class Action. For these reasons, too, Defendant Mahoney breached his fiduciary duties,

faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

158. Additional reasons that demand on Defendant Fujimori is futile to follow. Defendant Fujimori has served as a Company director since July 2016. He also served as the Chair of the Risk, Science, and Technology Committee at all relevant times. Defendant Fujimori received and continues to receive handsome compensation for his role as a Company director. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, his insider sale made during the Relevant Period while the price of the Company's stock was artificially inflated due to the misrepresentations discussed herein further demonstrate his motive in participating in the fraud. For these reasons, too, Defendant Fujimori breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

159. Additional reasons that demand on Defendant Habiger is futile to follow. Defendant Habiger has served as a Company director since July 2024. He also serves as a member of the Audit Committee and the Executive Compensation and Human Resources Committee. Defendant Habiger received and continues to receive handsome compensation for his role as a Company director. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Habiger

breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

160. Additional reasons that demand on Defendant Ludwig is futile to follow. Defendant Ludwig has served as a Company director since March 2014 and as Lead Independent Director since May 2016. He also serves as a member of the Audit Committee and the Nominating and Governance Committee. Defendant Ludwig received and continues to receive handsome compensation for his role as a Company director. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, his insider sale made during the Relevant Period while the price of the Company's stock was artificially inflated due to the misrepresentations discussed herein further demonstrate his motive in participating in the fraud. For these reasons, too, Defendant Ludwig breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

161. Additional reasons that demand on Defendant Mega is futile to follow. Defendant Mega has served as a Company director since June 2023. She also serves as a member of the Executive Compensation and Human Resources Committee and the Risk, Science, and Technology Committee. Defendant Mega received and continues to receive handsome compensation for her role as a Company director. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For

these reasons, too, Defendant Mega breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

162. Additional reasons that demand on Defendant Morano is futile follow. Defendant Morano has served as a Company director since June 2023. She also serves as the Chair of the Nominating and Governance Committee and as a member of the Audit Committee. Defendant Morano received and continues to receive handsome compensation for her role as a Company director. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Morano breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

163. Additional reasons that demand on Defendant Pegus is futile to follow. Defendant Pegus has served as a Company director since May 2024. She also serves as the current Chair of the Risk, Science, and Technology Committee and as a member of the Executive Compensation and Human Resources Committee. Defendant Pegus received and continues to receive handsome compensation for her role as a Company director. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Pegus breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore,

excused.

164. Additional reasons that demand on Defendant Sununu is futile to follow. Defendant Sununu has served as a Company director since April 2009. He also served as the Chair of the Nominating and Governance Committee and as a member of the Audit Committee at all relevant times. Defendant Sununu received and continues to receive handsome compensation for his role as a Company director. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Sununu breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

165. Additional reasons that demand on Defendant Wichmann is futile follow. Defendant Wichman has served as a Company director since June 2021. He also serves as the Chair of the Audit Committee and as a member of the Risk, Science and Technology Committee. Defendant Wichmann received and continues to receive handsome compensation for his role as a Company director. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Wichmann breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

166. Additional reasons that demand on Defendant Zane is futile follow. Defendant Zane has served as a Company director since April 2016. She also serves as the Chair of the Executive

Compensation and Human Resources Committee and as a member of the Nominating and Governance Committee. Defendant Zane received and continues to receive handsome compensation for her role as a Company director. As a trusted, long-time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, her insider sales made during the Relevant Period while the price of the Company's stock was artificially inflated due to the misrepresentations discussed herein further demonstrate her motive in participating in the fraud. For these reasons, too, Defendant Zane breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

167. Additional reasons that demand on the Board is futile follow.

168. Defendants Wichmann, Habiger, Ludwig, Morano, and Sununu (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Audit Committee Charter. Thus, the Audit Committee Defendants breached

their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

169. Defendants Fujimori, Mega, Pegus, and Wichmann (the "Risk, Science and Technology Defendants") served as members of the Risk, Science and Technology Committee at all relevant times. As such, they were responsible for, *inter alia*, the oversight of compliance with the Code of Conduct, reviewing and assessing the Company's science, technology, and innovation strategy and priorities, and staying informed of potential disruptive science and technology trends, opportunities and risks. Specifically, during the Relevant Period, the Risk, Science and Technology Committee Defendants downplayed the impact of new entrants in Boston Scientific's EP segment providing guidance and input to the Board and management and failed to report violations of the Code of Conduct. Thus, the Risk, Science and Technology Committee breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

170. All the Director-Defendants breached the duty of candor by making, or causing the Company to make, false and misleading statements regarding the Company's business, operations, and prospects, despite having knowledge of the falsity of those statements. The Director-Defendants may not be indemnified for breaching the duty of candor. As a result, all the Director-Defendants face a substantial likelihood of liability and cannot evaluate a demand with disinterest. Therefore, demand is futile, and thus, excused.

171. In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and

regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, and conduct business in an honest and ethical manner. Thus, the Director-Defendants face a substantial likelihood of liability, and demand is futile as to them.

172. The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

173. The acts complained of herein constitute violations of fiduciary duties owed by Boston Scientific's officers and directors, and these acts are incapable of ratification.

174. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Boston Scientific. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Boston Scientific, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such

insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

175. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Boston Scientific to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

176. Thus, for all the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least six of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**FIRST CLAIM**
**Against the Individual Defendants for Breach of Fiduciary Duties**

177. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

178. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Boston Scientific's business and affairs.

179. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

180. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Boston Scientific.

181. In breach of their fiduciary duties owed to Boston Scientific, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1)

the impact new entrants to the market would have on the EP segment was understated; (2) the growth rate and competitive advantage of the EP segment was overstated; and (3) therefore, the Company's financial outlook as provided to investors lacked a reasonable basis. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

182. Moreover, during the Relevant Period, while the Company's stock price was artificially inflated due to the foregoing misrepresentations, six of the Individual Defendants breached their fiduciary duties by selling shares of Company stock on inside information, for which they received combined total proceeds of approximately $38.9 million.

183. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, thus rendering them personally liable to the Company for breaching their fiduciary duties.

184. Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

185. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or

recklessly and for the purpose and effect of artificially inflating the price of Boston Scientific's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

186. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

187. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Boston Scientific has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

188. Plaintiff, on behalf of Boston Scientific, has no adequate remedy at law.

**SECOND CLAIM**
**Against the Individual Defendants for Unjust Enrichment**

189. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

190. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Boston Scientific.

191. The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from Boston Scientific that was tied to the performance or artificially inflated valuation of Boston Scientific or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

192. Plaintiff, as a shareholder and a representative of Boston Scientific, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of

their fiduciary and contractual duties.

193. Plaintiff, on behalf of Boston Scientific, has no adequate remedy at law.

**THIRD CLAIM**
**Against the Individual Defendants for Waste of Corporate Assets**

194. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

195. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Boston Scientific to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

196. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

197. Plaintiff, on behalf of Boston Scientific, has no adequate remedy at law.

**FOURTH CLAIM**
**Against the Individual Defendants for Gross Mismanagement**

198. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

199. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Boston Scientific in a manner consistent with the operations of a publicly held corporation.

200. As a direct and proximate result of the Individual Defendants' gross

mismanagement and breaches of duty alleged herein, Boston Scientific has sustained and will continue to sustain significant damages.

201. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

202. Plaintiff, on behalf of Boston Scientific, has no adequate remedy at law.

**FIFTH CLAIM**
**Against the Individual Defendants for Abuse of Control**

203. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

204. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Boston Scientific, for which they are legally responsible.

205. As a direct and proximate result of the Individual Defendants' abuse of control, Boston Scientific has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

206. Plaintiff, on behalf of Boston Scientific, has no adequate remedy at law.

**SIXTH CLAIM**
**Against Defendants Mahoney, Monson, Stein, Fitzgerald, and Spadea-Anello for Contribution Under Sections 10(b) and 21D of the Exchange Act**

207. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

208. Boston Scientific and Defendants Mahoney, Monson, Stein, Fitzgerald, and Spadea-Anello are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in

whole or in part due to Defendants Mahoney's, Monson's, Stein's, Fitzgerald's, and Spadea-Anello's willful and/or reckless violations of their obligations as officers and/or directors of Boston Scientific.

209. Defendants Mahoney, Monson, Stein, Fitzgerald, and Spadea-Anello, because of their positions of control and authority as officers and/or directors of Boston Scientific, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Boston Scientific, including the wrongful acts complained of herein and in the Securities Class Action.

210. Accordingly, Defendants Mahoney, Monson, Stein, Fitzgerald, and Spadea-Anello are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

211. As such, Boston Scientific is entitled to receive all appropriate contribution or indemnification from Defendants Mahoney, Monson, Stein, Fitzgerald, and Spadea-Anello.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Boston Scientific, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that each of the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Boston Scientific;

(c) Determining and awarding to Boston Scientific the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Boston Scientific and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Boston Scientific and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Boston Scientific to nominate at least six candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e) Awarding Boston Scientific restitution from Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: March 16, 2026

**THE BROWN LAW FIRM, P.C.**

*/s/Elizabeth Donohoe*
Elizabeth Donohoe
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: edonohoe@thebrownlawfirm.net
tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

**VERIFICATION**

I, Greg Valen, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 14th day of March 2026.

DocuSigned by:
Greg Valen
0391576DAEFF4A8...
Greg Valen